42 F.3d 719
 96 Ed. Law Rep. 377
 George SILANO, By and on behalf of himself and the high
school students in the Sag Harbor Union Free
School District, Plaintiff-Appellant,
v.
SAG HARBOR UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION,
Thomas Roy, Dr., Individually, and in his official capacity
as Superintendent, Patricia Brandt, Individually, and in her
official capacity as President of the Board of Education,
Thomas Horn, Jr., Individually, and in his official capacity
as Vice President of the Board of Education, Defendants-Appellees.
 No. 387, Docket 94-7025.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 20, 1994.
Decided Dec. 8, 1994.
 
 Patricia Weiss, Sag Harbor, NY, for plaintiff-appellant.
 Richard Hamburger (Block, Amelkin & Hamburger, Smithtown, NY), for defendants-appellees.
 Before: VAN GRAAFEILAND, MINER, and McLAUGHLIN, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-appellant George Silano appeals from a judgment entered on December 20, 1993 in the United States District Court for the Eastern District of New York (Spatt, J.), granting summary judgment in favor of defendants-appellees, the Sag Harbor Union Free School District Board of Education ("the Board"), Dr. Thomas Roy, the Superintendent of the Sag Harbor school system, Patricia Brandt, President of the Board, and Thomas Horn, Jr., Vice President of the Board, and dismissing Silano's complaint.
 
 BACKGROUND
 
 2
 Silano, a member of the Board and a retired filmmaker, had volunteered to lecture to three Sag Harbor High School mathematics classes on February 4, 1993 concerning the "persistence of vision" phenomenon. To illustrate this phenomenon to the class, Silano brought along six 35mm film clips. Silano testified in a deposition that he selected these particular film clips because he believed that a variety of static and frenetic frames would best illustrate the "persistence of vision" phenomenon and because they were the only 35mm film clips he had in his home. One of these clips, the "Birth Scene," portrayed two women and one man naked from the waist up.
 
 
 3
 Silano's first lecture was to a tenth-grade mathematics class. About half-way through his lecture, the film clips were passed around the class. Silano never drew the students' attention to the Birth Scene, and he confined his discussion solely to the persistence of vision phenomenon. Following his lecture, the school principal, who had been present for a portion of the presentation, advised Silano not to use the Birth Scene for the remaining two lectures. Silano agreed, and later testified that his two remaining lectures were unaffected by the absence of the Birth Scene film clip.
 
 
 4
 On February 8, 1993, Silano wrote a letter of apology to the first class to which he had lectured. In this letter, he conceded that the Birth Scene may have been "inappropriate for the topic under discussion" and acknowledged that some students in the class "may have thought it provacative [sic]." Apparently, the apology was not enough for the defendants-appellees and some parents.
 
 
 5
 On February 18, 1993, Superintendent Roy issued an executive order in which he condemned Silano's poor judgment in selecting materials to present to tenth-grade students. The order barred Silano from visiting the Sag Harbor schools during school hours for the remainder of the academic year. However, this order specifically provided that Silano would continue to have access to the Board's central office to carry out his Board of Education duties, and that he could attend sporting events and other school functions. The order further provided that Silano could seek modification or termination of the visitation ban by petitioning the Board.
 
 
 6
 The Board held its regular monthly meeting on February 22, 1993. Silano was unable to attend the meeting, and he asked that any discussion or action regarding his lectures be postponed until the next meeting. This request was disregarded. At the meeting, President Brandt offered a resolution criticizing Silano's poor judgment in showing a film clip exhibiting nude actors to the tenth-grade mathematics class. The resolution included a censure of Silano. This resolution, drafted by counsel to the School Board, was unanimously adopted by the six Board members present.
 
 
 7
 Silano promptly appealed the Superintendent's order and the Board's censure to the New York State Commissioner of Education. On July 22, 1993, the Commissioner ruled that the Superintendent had the authority to ban Silano from the Sag Harbor schools during school hours because the ban did not interfere with Silano's duties as a member of the Board. In reaching this conclusion, the Commissioner relied on the fact that under New York State law, school board members do not have a right to make official visits to schools without express authority from the school board. As to the Board's resolution, the Commissioner held that, although the Board had the authority to criticize Silano for exercising poor judgment, it did not have the authority to censure Silano. The Commissioner therefore annulled the paragraph of the resolution censuring Silano.
 
 
 8
 Prior to the Commissioner's decision, Silano commenced this action under 42 U.S.C. Sec. 1983, alleging that his First Amendment right of free speech and his Fourteenth Amendment due process rights were violated by the Superintendent's February 18, 1993 order and the Board's February 22, 1993 censure resolution. During this litigation, Silano, for the first time, asserted that the Birth Scene demonstrated the equal rights of men and women to appear together bare-chested. The district court granted defendants' motion for summary judgment, holding that Silano's First Amendment rights were not violated because (a) the classroom was not a public forum, (b) the Board is entitled to control the school's curriculum, and (c) the subject of the lecture had nothing to do with gender equality. The district court also rejected Silano's due process claim, finding that the actions of defendants-appellees had not deprived Silano of a protected property or liberty interest. Finally, the court held that the individual defendants were entitled to qualified immunity because they were acting within their discretion and not in violation of any clear constitutional or statutory rights. Silano appeals the district court's grant of summary judgment in favor of defendants-appellees and the dismissal of his complaint.
 
 DISCUSSION
 
 9
 Summary judgment is proper when the moving party establishes, through affidavits and other evidence, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We review the district court's grant of summary judgment de novo. Peoples Westchester Sav. Bank v. Federal Deposit Ins. Corp., 961 F.2d 327, 330 (2d Cir.1992). In this case, the material facts were not in dispute and the district court properly granted summary judgment for defendants.
 
 1. First Amendment Claim
 
 10
 First, we address the dismissal of Silano's First Amendment claims. The district court dismissed Silano's claims on the ground that, as a matter of law, he had no First Amendment right to show photographs of bare-chested women to tenth-grade mathematics students during a lecture on a scientific phenomenon. We agree with the district court.
 
 
 11
 The Supreme Court consistently has held that teachers and students do not "shed their constitutional rights to freedom of speech ... at the schoolhouse gate." Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). On the other hand, the Court also has recognized that public schools may limit classroom speech to promote educational goals. See Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266-67, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988); Tinker, 393 U.S. at 506-07, 89 S.Ct. at 736. In light of these competing concerns, the Supreme Court has held that educators may limit the content of school-sponsored speech so long as the limitations are "reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571. Thus, the ultimate authority to determine " 'what manner of speech in the classroom ... is inappropriate properly rests with the school board,' rather than with the federal courts." Id. at 267, 108 S.Ct. at 568 (quoting Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986)) (internal citation omitted). School officials are in the best position to ensure that their students "learn whatever lessons [an] activity is designed to teach, [and] that readers or listeners are not exposed to material that may be inappropriate for their level of maturity." Id. at 271, 108 S.Ct. at 570. Whether a school official's action is reasonably related to a legitimate pedagogical concern "will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation." Ward v. Hickey, 996 F.2d 448, 453 (1st Cir.1993); see Hazelwood, 484 U.S. at 271, 274, 108 S.Ct. at 570, 571.
 
 
 12
 While Silano was merely a guest lecturer, rather than a teacher employed by the Board, the Supreme Court has recognized that school administrators may exercise authority over "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." Hazelwood, 484 U.S. at 271, 108 S.Ct. at 570. Given that Silano's lecture took place in a traditional classroom setting and was designed to impart particular knowledge to the student participants, we conclude that the "legitimate pedagogical concern" test of Hazelwood is the appropriate measure of the school administration's authority to restrict Silano's speech. Certainly, Silano, a guest in the classroom, was entitled to no more deference than a trained education professional.
 
 
 13
 Applying the Hazelwood standard, we agree with the district court that the undisputed facts show that the actions of the Sag Harbor school officials were reasonably related to legitimate pedagogical concerns. Silano received permission to lecture the tenth-grade mathematics classes on the "persistence of vision." Depictions of bare-chested women were entirely unnecessary to illustrate this scientific phenomenon. In fact, Silano's two subsequent presentations, conducted without the disputed film clip, were, by his own admission, just as successful in demonstrating and explaining "persistence of vision."
 
 
 14
 Silano now contends that the Birth Scene was intended to express a message of gender equality. However, during the class period, there was no discussion, or even reference, to the subject of nudity, women's breasts, gender-neutrality, or a woman's right to appear bare-chested in circumstances in which a man is entitled to appear bare-chested. The fact that Silano brought the Birth Scene film clip to class only because it was among the six 35mm film clips he had in his home further demonstrates the post-hoc nature of his purported gender-equality message. Given that the disputed film clip was entirely unnecessary to the subject matter of Silano's lecture, the school officials had a legitimate pedagogical purpose in restricting the display of photographs of bare-chested women in a tenth-grade classroom.
 
 
 15
 Silano argues that the district court erred in applying the Hazelwood test because his film clips are more akin to library resources than to school curriculum. In Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 869-72, 102 S.Ct. 2799, 2809-10, 73 L.Ed.2d 435 (1982), a plurality of the Supreme Court held that school administrators could not remove books from a school library to suppress political ideas with which the administrators disagreed. Silano asserts that the disputed film clip falls within the heightened protection provided to library resources. This contention is without merit. The Supreme Court has stated that school activities that "are supervised by faculty members and designed to impart particular knowledge or skills to student participants" should be considered curriculum. Hazelwood, 484 U.S. at 271, 108 S.Ct. at 570. Moreover, the distinguishing factor between library resources and curriculum is that library resources are something that students voluntarily may view at their leisure, whereas curriculum is required material for students. Pico, 457 U.S. at 869, 102 S.Ct. at 2809 (plurality opinion). Here, the students were required to attend mathematics class, their teacher was present, and the purpose was to impart knowledge of how filmmaking relates to mathematics. The district court's finding that the lectures were analogous to curriculum was correct.
 
 
 16
 Silano also contends that the School Board was required to have clearly-established rules and procedures in place for regulating the curriculum. In Hazelwood, the Supreme Court explicitly rejected this requirement, stating that "[t]o require such regulations in the context of a curricular activity could unduly constrain the ability of educators to educate." 484 U.S. at 273 n. 6, 108 S.Ct. at 571 n. 6. Having concluded that school administrators can exercise at least as much control over the speech of guest lecturers as teachers, we conclude that specific regulations were not required in this context.
 
 
 17
 Because Silano had no First Amendment right to use a film-clip showing bare-breasted women in a lecture to a tenth-grade mathematics class intended to explain the "persistence of vision," we conclude that the district court properly entered summary judgment against Silano on his First Amendment claims.
 
 2. Due Process
 
 18
 Silano also challenges the Board's censure and the Superintendent's order on due process grounds. The district court held that Silano was not deprived of any property or liberty interests, and, in the alternative, that the only process Silano was due was the post-deprivation hearing that he was accorded. We agree that Silano has failed to establish the deprivation of a liberty or property interest protected by the Due Process Clause.
 
 
 19
 First, we address the Board's resolution censuring Silano. Damage to reputation alone, even by a government entity, does not implicate a liberty interest protected by the Due Process Clause. See Paul v. Davis, 424 U.S. 693, 701, 706, 96 S.Ct. 1155, 1160-1163, 47 L.Ed.2d 405 (1976). Our cases have interpreted Paul to require the modification or termination of some legal right or status before damage to reputation rises to the level of a constitutional deprivation. See Martz v. Incorporated Village of Valley Stream, 22 F.3d 26, 31-32 (2d Cir.1994); Neu v. Corcoran, 869 F.2d 662, 667 (2d. Cir.), cert. denied, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989). As the district court properly concluded, Silano has failed to put forth any evidence showing that the Board's censure affected any legal right or status. Accordingly, the Board's censure did not implicate a liberty interest protected by the Due Process Clause.
 
 
 20
 The Superintendent's order forbidding Silano from entering the school grounds also fails to implicate a protected liberty or property interest. Property and liberty interests protected by the Due Process Clause are ordinarily created and defined by state law. See Paul, 424 U.S. at 709, 96 S.Ct. at 1164. As a Board of Education member, Silano did not have an unrestricted right to enter the school classrooms or hallways during school hours. See Coughlan v. Cowan, 21 Misc.2d 667, 190 N.Y.S.2d 934, 937 (Sup.Ct.1959); Matter of Bruno, 4 Ed.Dept.Rep. 14, 17-18 (1964). Moreover, the Superintendent's memorandum specifically provided Silano with access to all facilities necessary for him to function as a member of the Board. Therefore, the district court was correct in its conclusion that the Superintendent's order did not deprive Silano of any property or liberty interest conferred upon him by his status as a member of the Board of Education.
 
 
 21
 Silano, however, contends that the Superintendent's visitation ban deprived him of a liberty interest conferred by School District Policy No. 3210 (1989) ("Policy 3210"). Policy 3210 states that the Board of Education "welcome[s] members of the community and other interested persons to visit the schools." Pursuant to this policy, the Superintendent is authorized to establish regulations to "encourage visitors" while "insur[ing] that such visits will enhance the effect of the educational program rather than hinder it." The policy also requires visitors to "sign in" at the main office and explain their presence, and obtain permission from the school principal before visiting classrooms.
 
 
 22
 "To create a constitutionally protected liberty interest, a state regulation must employ 'language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed....' " Russell v. Coughlin, 910 F.2d 75, 77 (2d Cir.1990) (quoting Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)). "It is only through 'the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates' " that a liberty interest arises. Purnell v. Lord, 952 F.2d 679, 684 (2d Cir.1992) (quoting Hewitt, 459 U.S. at 472, 103 S.Ct. at 871). For example, in Purnell, we rejected plaintiff's argument that a liberty interest was created by a policy directive stating that "[t]he sending and receiving of mail by inmates will be restricted only to the extent necessary to prevent physical injury to persons, maintain security and good order in the facilities, and prevent interference in the general public order." Id. We held that this general policy statement did not create a liberty interest because it did not "contain language 'requiring specific substantive predicates' to be followed in connection with the establishment or revocation of an inmate's authorization to correspond with another inmate." Id.
 
 
 23
 Applying these standards, we conclude that Policy 3210 does not vest the public with a protected liberty interest in visiting Sag Harbor schools. The policy does not impose any obligations upon school officials. The only mandatory language in the policy statement is directed toward visitors, requiring them to "sign in" and explain their presence, and to obtain permission in advance if they wish to visit a classroom. Moreover, by requiring visitors to "sign in" and explain their presence, this policy clearly contemplates that certain types of visits and visitors would be inappropriate in the school environment, thus calling for school officials to exercise their discretion. See Hernandez v. Coughlin, 18 F.3d 133, 137 (2d Cir.) ("[I]t is clear that these regulations contain no specific set of criteria that when met would make participation in [the program] mandatory, or that would significantly limit a prison official's discretion."), cert. denied, --- U.S. ----, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). In fact, the policy specifically authorizes the Superintendent to establish regulations to ensure that visits do not "hinder" the educational program. For these reasons, we cannot say that the School District's general policy of welcoming visitors created a liberty interest protected by the Due Process Clause. We therefore agree with the district court that the temporary ban on Silano's visits to the Sag Harbor schools did not violate his due process rights.
 
 
 24
 In light of our conclusion that the censure resolution and visitation ban did not violate Silano's constitutional rights, we need not reach the merits of the qualified immunity defense interposed by the individual defendants.
 
 CONCLUSION
 
 25
 For the foregoing reasons, the judgment of the district court is affirmed.