Sylvia **RODRIGUEZ**, individually and on behalf of her minor child, Les Andrew Kelly, Plaintiffs–Appellees,

v.

Marjorie **McLOUGHLIN**, individually and as Executive Director of Cardinal McCloskey Children's and Family Services, Barbara McMurray, individually and as Foster Boarding Home Director of Cardinal McCloskey Children's and Family Services, Cardinal McCloskey Children's and Family Services, Defendants–Cross–Claimants– Appellants,

New York City Dept. of Social Services, New York City Child Welfare Administration, and The City of New York, Defendants–Cross–Defendants–Appellants.

Docket Nos. 99–7020, 99–7039, 99–7089

United States Court of Appeals, Second Circuit.

Argued: Sept. 23, 1999

Decided: June 5, 2000

Jonathan M. Sobel, New York, New York (Howard Seife, Romy Berk, Chadbourne & Parke, New York, New York, on the brief), for Plaintiffs–Appellees.

Christopher H. Cloud, New York, New York (Kenneth J. Gomley, Capriano Lichtman & Flach, New York, New York, on the brief), for Defendants–Cross–Claimants–Appellants

Alan G. Krams, New York, New York (Jeffrey D. Friedlan der, First Assistant Corporat ion Counsel of the City of New York, Leonard Koerner, Kristin M. Helmers, New York, New York, on the brief), for Defendants–Cross–Defendants–Appellants.

Before: WINTER, Chief Judge, KEARSE, Circuit Judge, and MORDUE, District Judge.*.

KEARSE, Circuit Judge:

Defendant Cardinal McCloskey Children's and Family Services ("McCloskey" or the "agency"), and defendants City of New York, New York City Child Welfare Administration ("CWA"), and New York City Department of Social Services (collec-

---

* Honorable Norman A. Mordue, of the United States District Court for the Northern District of New York, sitting by designation.

tively "the City" or "the City defendants") appeal from a partial final judgment entered in the United States District Court for the Southern District of New York, Kimba M. Wood, *Judge,* following a jury verdict awarding plaintiff Sylvia Rodriguez, suing individually and on behalf of her adopted minor child Les Andrew Kelly ("Andrew"), a total of $40,001 in compensatory, punitive, and nominal damages against McCloskey, and a total of $10,001 in compensatory and nominal damages against the City, for due process violations found by the court in connection with the temporary removal of Andrew from Rodriguez's home when he was her foster child. Defendants Marjorie McLoughlin and Barbara McMurray, employees of McCloskey who were not parties to the trial, appeal from an order of the district court ruling that they are not entitled to qualified immunity on the claims asserted by Rodriguez.

On appeal, all defendants contend principally that the district court erred in ruling that plaintiffs have a cognizable liberty interest. McCloskey and the individual defendants also contend, *inter alia,* that plaintiffs, even if they had such an interest, were not denied procedural due process; and the individual defendants pursue their defense of qualified immunity. For the reasons that follow, we conclude that Rodriguez and Andrew did not possess a liberty interest in their foster-parent-and-child relationship, and we therefore reverse the judgment and order of the district court and remand for dismissal of the complaint.

## I. BACKGROUND

Andrew, whose father is unknown, was born on March 15, 1990, to a mother who promptly abandoned him. Thirteen days later, McCloskey, an authorized foster care agency for the City, placed Andrew in the home of Rodriguez. Rodriguez soon expressed an interest in adopting Andrew.

### A. *The Planned Adoption*

Andrew had limited contact with his biological mother, and McCloskey determined that his best interests would be served by adoption. In June 1993, a family court order terminated Andrew's natural mother's parental rights and transferred legal guardianship and custody to McCloskey and the City.

In August 1993, Rodriguez and McCloskey entered into a one-page standard New York State form agreement ("Adoptive Placement Agreement" or "Agreement") in contemplation of Andrew's adoption by Rodriguez. In the agreement, Rodriguez agreed to "receive" Andrew in her home, and "[i]n so doing ... agree[d] that":

We will care for this child and meet the child's needs. However, the child will, where eligible, continue to receive medical, psychological, and surgical services in accordance with the medical assistance or medical subsidy programs to the extent permitted by law.

We are taking this child with the intention of adoption although we understand that legal custody remains with Card. McCloskey and that this adoptive placement agreement remains in effect until the date of legal adoption.

The legal adoption will take place after both Card. McCloskey and we agree that it is in the child's best interest.

In the period prior to legal adoption a representative from Card. McCloskey will visit us and the child periodically and that we may call on the agency for consultation.

If at any time prior to legal adoption it is determined by the agency or by us that the child should be removed from our home, we will cooperate with the agency in carrying this out in a way that serves the best interest of the child in the judgement of the agency.

It is duly acknowledged by the parties hereto that the adoptive parent(s) shall have the right to intervene as an interested party in any proceeding commenced to set aside a surrender purporting to commit a guardianship or custody of a child placed in the home of the adoptive parent(s). Such interven-

tion shall be made anonymously or in the true name(s) of the above.
(Adoptive Placement Agreement dated August 9, 1993.)

In November 1993, a McCloskey case planner reported to CWA that McCloskey intended to finalize Andrew's adoption by Rodriguez, noting that the agency was awaiting a court date for finalization. By March 1994, most of the paperwork required for the adoption had been processed. However, a special adoption subsidy had yet to be approved, and according to the deposition testimony of the McCloskey employee who handled the adoption, the adoption application would not be submitted to the court without the subsidy approval because without it the court would not act.

### B. *The Events Leading to This Action*

On March 18, 1994, McCloskey case planner Venton Monplaisir went to Rodriguez's home for a scheduled visit. Rodriguez, attending a court appointment, was not at home. Andrew, then four years old, and Thomas Green ("Thomas"), Rodriguez's other foster child, who was three years old, were at home, tended only by Rodriguez's grandson Edwin Rodriguez ("Edwin"), a twelve-year-old emotionally handicapped, special-education student. Monplaisir observed that Edwin appeared to be having difficulty managing Andrew and Thomas, and indeed appeared to be overwhelmed by them. At one point, Andrew and Thomas ran out of the apartment and down the hallway, causing Monplaisir to fear that they might tumble down the stairs. Although Rodriguez maintains that she had arranged for a neighbor to baby-sit, it is undisputed that no adult arrived to take responsibility during the time that Monplaisir was there.

After approximately two hours, Monplaisir contacted his supervisor at McCloskey and was instructed to remove Andrew and Thomas from Rodriguez's home, which he did. Andrew and Thomas were then transferred to a new foster home. McCloskey filed a Report of Suspected

Child Abuse or Maltreatment with the New York State ("State") Department of Social Services ("State DSS"), which in turn triggered an investigation by CWA's Office of Confidential Investigations ("OCI"). On the day Andrew was removed, Rodriguez telephoned McCloskey with regard to his return and was told that there would have to be an investigation. On April 1, Rodriguez requested an independent review by CWA of McCloskey's decision to remove Andrew, and a "fair hearing" before the State DSS pursuant to N.Y. Comp.Codes R. & Regs. tit. 18, § 443.5(c) (1999).

While the matter was being investigated, Rodriguez sought to visit Andrew. McCloskey denied permission pending its evaluation of whether visitation would be in Andrew's best interests while the OCI investigation was ongoing. McCloskey did not allow a visit until June 27, when Rodriguez was allowed to see Andrew for half an hour; she was allowed another visit of similar duration on July 8.

In the meantime, on April 19, 1994, OCI determined that McCloskey's view that the events of March 18 constituted child maltreatment should be rejected. It found that there was "no credible evidence to substantiate" that view, although it recommended that Rodriguez receive training in providing proper supervision for children. OCI sent its report to McCloskey on June 20. McCloskey disagreed with OCI's determination, however, and refused to return Andrew to Rodriguez pending the outcome of the independent review by CWA.

Thereafter, CWA, in its Decision After Independent Review dated July 11, 1994 ("CWA Decision"), ordered McCloskey to return Andrew to Rodriguez. CWA stated that the March 18 removal "may be considered arguably valid" (CWA Decision at 9); but it concluded that the ensuing denial of visitation was "very questionable since neither Mrs. Rodriguez nor ... Andrew could obviously have been prepared for their separation from each other and visiting

could have helped the child's understanding of the situation" (*id.*). While endorsing OCI's recommendation that Rodriguez receive training, CWA also recommended that the adoption process be reinitiated following a 90–day period of close agency supervision.

Andrew was returned to Rodriguez on July 13, 1994. The adoption process resumed in January 1995, and Rodriguez's adoption of Andrew was finalized in August 1995.

In March 1996, Rodriguez commenced the present action under 42 U.S.C. § 1983 on behalf of herself and Andrew as her minor child, asserting due process violations. The complaint alleged that Andrew's health and safety did not warrant his summary removal from Rodriguez's home on March 18, 1994, and that McCloskey had unconstitutionally deprived Rodriguez of notice and an opportunity to be heard prior to its interference with her right as a foster and preadoptive parent and with the liberty interests of herself and Andrew in family integrity. The complaint also alleged that McCloskey had wrongfully, arbitrarily, and capriciously denied Rodriguez a meaningful opportunity to be heard in connection with its refusal to return Andrew to her home and its denial of visitation. Plaintiffs alleged that McLoughlin, as McCloskey's executive director, and McMurray, as its foster boarding home director, had failed to correct the unconstitutional actions of the agency's employees; and that the City defendants, due to deliberate indifference reflective of a municipal custom, policy, and practice, had failed to provide adequate training for foster care agencies under their direction, including McCloskey, thereby causing the deprivations suffered by Rodriguez and Andrew.

### C. *The Decisions of the District Court*

Defendants moved to dismiss the complaint on various grounds, contending principally that as foster parent and child who had not completed adoption proceedings, Rodriguez and Andrew did not have liberty interests recognized by state law.

McCloskey also contended that Rodriguez had received the process to which she was due, and the individual defendants contended that they were entitled to qualified immunity.

In an Opinion and Order dated September 15, 1998, published at 49 F.Supp.2d 186–207, the district court granted in part and denied in part defendants' motions to dismiss. The court dismissed the claim that the summary removal of Andrew from Rodriguez's home on March 18, 1994, was unjustifiable. The court stated that even accepting Rodriguez's assertions as to the arrangements she had made for the care of Andrew and Thomas during her absence on that day, plaintiffs

> cannot avoid the fact that there was no adult present to supervise Ms. Rodriguez's three and four-year old children when Mr. Monplaisir arrived for a scheduled visit to the home, nor that no adult arrived to assume responsibility for the children during the time (of at least two hours) that he was present. Further, Mr. Monplaisir observed that Edwin was having difficulty keeping the children under control, and appeared to be overwhelmed by the situation. Thus, in the time before McCloskey removed the children, Ms. Rodriguez had violated New York's foster care regulations requiring that foster children under 10 years must never be left without adult supervision. *See* N.Y. Comp.Codes R. & Regs. tit. 18 § 444.5(c)(3).

> In the context of this case, this violation itself provides an objective basis for McCloskey's belief that leaving a three and four-year old in the care of only a twelve-year old boy posed an imminent threat to the health or safety of the children. But even without this regulatory violation, the Court would conclude that no reasonable juror could find that McCloskey lacked an objective basis to believe that Andrew and Thomas were left bereft of supervision so as to pose a sufficient threat to these children's health or safety to justify an emergency

removal. As long as there is an objective basis for fear of imminent injury to the children, it is not the role of the court (either on a motion or through a jury verdict) to second-guess, with the benefit of hindsight, the case worker's and foster agency officials' on-the-spot determination to remove a child left without adult supervision. Accordingly, the Court grants summary judgment in favor of defendants as to plaintiff's claim that the circumstances did not justify an emergency removal, and thus dismisses plaintiff's claim that she was entitled to pre-removal notice and an opportunity to be heard.

49 F.Supp.2d at 202–03.

The court denied, however, defendants' motions to dismiss so much of the complaint as alleged denial of a reasonable postremoval hearing and denial of visitation, ruling as a matter of law that with respect to

a New York foster mother who was in the final stages of adopting her foster child, whom she had cared for continuously since his first weeks of infancy[,] ... there is a constitutionally protected liberty interest in the stability and integrity of the relationship between such a foster mother and foster child.

Id. at 189. The court noted that Andrew had never known his biological parents, that he had been continuously in Rodriguez's care from the first month of his life until his removal on March 18, 1994, and that Rodriguez had held the same place in Andrew's emotional life and fulfilled the same socializing functions as a biological parent or relative. See id. at 195. The court pointed out that New York has statutes and regulations (see Part II.B. below) that, inter alia, give foster parents who have had custody for more than 12 continuous months the right to notice of proceedings involving the child's status, see N.Y. Soc. Serv. Law § 392(4)(c) (McKinney Supp.2000); give foster parents priority over others with respect to the child's adoption, see N.Y. Comp.Codes R. & Regs. tit. 18, § 421.13(a) (1995); and offer an adoption subsidy for foster parents at-

tempting to adopt a child who has been in their care for more than 18 months, see id. § 421.24(a)(3)(iii)(f) (1996). See 49 F.Supp.2d at 197–98. The court concluded that "New York recognizes that such long-term foster parents have an interest in their foster children's custody status," and encourages "potential adoptive parents to become foster parents as a means to adoption." Id. at 198.

The district court noted that "Andrew's biological mother's parental rights had been terminated," id. at 199; that "neither McCloskey nor CWA had plans to return him to his biological mother or to find his biological father," id.; that Rodriguez was "a prospective adoptive parent who had entered into an Adoptive Placement Agreement," id. at 196, by which "the State (through McCloskey) expressed its interest in Andrew's adoption by Ms. Rodriguez, so long as McCloskey continued to view adoption as in Andrew's best interest," id.; and that the parties were "awaiting adoption finalization from the family court," id. at 199. The court found that Rodriguez

cannot be said to have expected her relationship with Andrew to end.... [W]hile Ms. Rodriguez's expectations as to Andrew at the outset of her relationship with him were not necessarily permanent, by the time that she entered the Adoptive Placement Agreement, such intentions and expectations of permanency had formed.

Id. at 196. The court concluded that

Rodriguez had a liberty interest within the Fourteenth Amendment's Due Process Clause in her relationship with her foster and prospective adoptive child Andrew at the time of his removal from her home on March 18, 1994. This holding recognizes such a liberty interest in only a discretely identifiable set of foster parents, (1) whose foster children's biological parents' parental rights have been terminated, (2) who have cared for their foster children continuously for more than twelve months since the

child's infancy, (3) and who have entered into an adoptive placement agreement for their foster child.

*Id.* at 199.

Noting that "[d]ue process fundamentally requires that the aggrieved party be provided with an opportunity to be heard, ' "at a meaningful time and in a meaningful manner," ' " *id.* at 200 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965))), the district court concluded that no rational juror could find that Rodriguez was afforded a timely post-removal hearing in order to contest Andrew's removal. Pointing out that "when the state removes a child from his biological parents' custody, it must provide an opportunity to contest the removal within weeks—not months—after the removal," the court stated that although Rodriguez's interest "may be less than that of a parent who is also the legal guardian of the child," it was nonetheless strong, and there was "no basis for distinguishing the foster child's interest in a prompt hearing from that of a biological child or an adopted child." 49 F.Supp.2d at 204. The court also saw in the foster relationship, as in the biological relationship, a similar potential for an erroneous deprivation of the parents' and child's interests in remaining together and no undue burden on the governmental entity to provide a prompt post-deprivation hearing. It concluded as follows:

> In view of Ms. Rodriguez's interest in not being erroneously separated from Andrew, the potential for such error in an emergency removal, and the fact that the state already provides an opportunity to be heard in non-emergency foster care removals, the Court finds that the delay from March 18, 1994 until June 15, 1994 in providing written notice of removal, and until June 28, 1994 in providing an opportunity to be heard to contest the removal, was not reasonably prompt, and therefore violated plaintiff's rights to due process guaranteed by the

Due Process Clause of the Fourteenth Amendment.

*Id.* at 205.

For similar reasons, the court found that the delay in affording Rodriguez a hearing violated her rights with respect to visitation:

> Ms. Rodriguez had an interest in visiting Andrew, if only to provide him with her own explanation of the separation, attempt to reduce his sense of abandonment, and ease her own concerns about his well-being. This interest in visiting Andrew during the time that he was removed from her care derives from her underlying interest in her relationship with Andrew. In view of the Court's holding above that Ms. Rodriguez has a constitutionally protected liberty interest in the stability of her relationship with Andrew, the Court concludes that the deprivation of any visitation between Ms. Rodriguez and Andrew during the time of his removal also implicates a constitutionally protected liberty interest.

*Id.* The court stated that

> [t]he risk of erroneous deprivation is similar to that involved in the underlying removal decision (if lessened slightly because the agency may have had more time to assess the basis for the removal decision). Where, as here, the child would not be endangered by supervised visits, and visits are likely to be important in countering the child's sense of abandonment, the government's goal to further the best interest of the child is not in conflict with allowing an opportunity to contest the failure to provide visitation. Because foster care agencies have resources for facilitating supervised visitation, and because of the potential benefit to the child of having contact with the only parent he has ever known, the Court holds that the failure of defendants to provide Ms. Rodriguez any opportunity to contest the decision not to allow her to visit Andrew from March 18, 1994 until June 28, 1994 vio-

lated Ms. Rodriguez's due process rights.

*Id.* at 205–06.

Finally, in a ruling that, as discussed below, was later rescinded, *see* 49 F.Supp.2d at 207–08, the court's September 15, 1998 opinion held that the individual defendants were entitled to dismissal of the complaint against them on the ground of qualified immunity.

Having dismissed the individual defendants, and having held as a matter of law that the failure to afford Rodriguez a timely postremoval hearing and the denial of visitation constituted due process violations, the court ordered a jury trial of those claims against McCloskey and the City on the issue of damages. At trial, the jury was instructed that the court had already determined that the decision to remove Andrew on March 18, 1994, was reasonable and lawful, but that the subsequent delay in providing Rodriguez with notice and an opportunity to be heard to contest the removal, and the denial of Rodriguez's request to visit Andrew for some three months, were unconstitutional. The jury was instructed that its task was to decide whether and to what extent Rodriguez and/or Andrew had suffered injury by reason of the delay and the denial of visitation.

The jury found that Rodriguez had suffered compensable injury, though Andrew had not. Against McCloskey, the jury awarded Rodriguez, in her own right, $20,000 in compensatory damages plus $10,000 in punitive damages, and awarded her on behalf of Andrew $1 in nominal damages plus $10,000 in punitive damages. Against the City, the jury awarded Rodriguez $10,000 in compensatory damages in her own right, and $1 in nominal damages on behalf of Andrew. Judgment was entered accordingly on December 28, 1998.

Following the trial, the district court revisited its pretrial decision dismissing the claims against the individual defendants on the ground of qualified immunity. In light of the Supreme Court's ruling in *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (prison guards employed by private for-profit management companies not entitled to qualified immunity in actions brought under § 1983), the district court concluded, in a January 8, 1999 Amended Opinion and Order, that qualified immunity was unavailable to the individual McCloskey employee defendants as a matter of law. *See* 49 F.Supp.2d at 207–08. The court accordingly vacated the September 15, 1998 Opinion's grant of summary judgment in favor of the individual defendants and ordered a trial against those defendants with respect to their individual responsibility for the denials of a postremoval hearing and visitation.

The individual defendants promptly appealed the amended interlocutory order denying them qualified immunity, *see generally X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 65 (2d Cir.1999) (a ruling as a matter of law rejecting a claim of qualified immunity is immediately appealable). Pursuant to Fed.R.Civ.P. 54(b), the district court certified the December 28, 1998 judgment, which reflected the jury's awards against the institutional defendants and the district court's holdings as to the existence and violations of plaintiffs' liberty interests, as a partial final judgment. McCloskey and the City have appealed that judgment.

## II. DISCUSSION

On these appeals, all defendants contend that the district court erred in ruling that, when Andrew was removed from Rodriguez's home, plaintiffs had cognizable liberty interests in living together and in postremoval visitation. In addition, McCloskey, McLoughlin, and McMurray contend that even if plaintiffs had constitutionally protected liberty interests, there was no lack of due process, and that in any event, McLoughlin and McMurray are entitled to qualified immunity. The City concedes that if a liberty interest existed, plaintiffs did not receive procedural due process. For the reasons that follow, we

conclude that at the time of Andrew's removal, plaintiffs did not have cognizable liberty interests. In light of that conclusion, we need not reach the parties' other contentions.

## A. *Due Process Principles*

■■■ A liberty interest may arise from either of " 'two sources—the Due Process Clause itself [or] the laws of the States.' " *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (quoting *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Among the liberty interests that may arise under the Due Process Clause itself is " 'freedom of personal choice in matters of . . . family life.' " *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 842, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) *("OFFER")* (quoting *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974)). "[T]he usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." *OFFER,* 431 U.S. at 843, 97 S.Ct. 2094.

■■■ Biological relationships obviously "are not [the] exclusive determination of the existence of a family"; the marriage relationship, which is the "basic foundation of the family in our society, is of course not a matter of blood relation," though it entails rights of privacy " 'older than the Bill of Rights.' " *Id.* (quoting *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)). "[T]he liberty interest in family privacy," whether biological or marital, "has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights, as they have been understood in this Nation's history and tradition." *OFFER,* 431 U.S. at 845, 97 S.Ct. 2094 (footnote and internal quotation marks omitted).

■■■ A foster family, whose relationships ordinarily are not based on blood or marriage, *but see Rivera v. Marcus,* 696 F.2d 1016 (2d Cir.1982) (recognizing protectable liberty interest of foster parent who was related biologically to her foster children), "has its source in state law and contractual arrangements." *OFFER,* 431 U.S. at 845, 97 S.Ct. 2094. This does not mean that the emotional bonds formed in a foster family may not be just as strong as those formed by blood or marriage. As the *OFFER* Court noted,

> [n]o one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship. At least where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family.

*Id.* at 844, 97 S.Ct. 2094 (footnote omitted). "[H]owever, whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset," *id.* at 845, 97 S.Ct. 2094, and

> where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties,

*id.* at 845–46, 97 S.Ct. 2094.

■■■ Although the *OFFER* Court ultimately chose not to resolve the question of the existence of a liberty interest, given the Court's holding that the plaintiffs before it had received adequate process, *see* 431 U.S. at 847, 97 S.Ct. 2094, the reasoning quoted above leads us to the conclusion that any liberty interest arising in the preservation of a biologically unrelated foster family would arise, if at all, only under state law and not under the Due Process Clause itself. Accordingly, we turn to the

question of whether plaintiffs had a liberty interest created by New York law.

 Mere expectations do not necessarily give rise to a state-created liberty interest protected by the Due Process Clause. "[A] State creates a protected liberty interest by placing substantive limitations on official discretion." *Kentucky Department of Corrections v. Thompson*, 490 U.S. at 462 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)). "[T]he most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decisionmaking ... and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Kentucky Department of Corrections v. Thompson*, 490 U.S. at 462, 109 S.Ct. 1904 (quoting *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. 864 ("specified substantive predicates")). To create a liberty interest, a statute or regulation must "contain 'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Department of Corrections v. Thompson*, 490 U.S. at 463, 109 S.Ct. 1904 (quoting *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. 864).

We note that *Kentucky Department of Corrections v. Thompson, Olim v. Wakinekona*, and *Hewitt v. Helms* all arose in a prison context, and that the Supreme Court in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), somewhat altered the analysis applicable to claims by prisoners by ruling that the mere presence of mandatory language does not necessarily mean that a liberty interest has been created, *see* 515 U.S. at 483–84, 115 S.Ct. 2293. That is, after *Sandin*, a prisoner is not necessarily protected by the Due Process Clause even if the pertinent prescribed substantive predicate for the action taken was in fact absent. We do not regard *Sandin* as overruling the principle for which we cite the *Thompson* line of cases, however. First, the *San-*din Court's modification of the *Thompson* analysis appears to be limited to the prison regulation context; the *Sandin* Court stated that the conclusion that a plaintiff has a right to due process protection where the language is mandatory and the substantive predicates are absent "may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public," *id.* at 481, 115 S.Ct. 2293. More importantly, *Sandin* does not disturb the *Thompson* principle that no liberty interest has been created by state law where there is no mandatory language. *See, e.g., id.* at 483 n. 5, 115 S.Ct. 2293 (noting that *Sandin* ruling did not technically overrule *Thompson*, because the *Thompson* Court had concluded that the lack of mandatory language in the case before it meant that no liberty interest had been created). This Court has applied that principle outside of the prisoner-rights context, *see Silano v. Sag Harbor Union Free School District Board of Education*, 42 F.3d 719, 724–25 (2d Cir.1994) (school board member not deprived of liberty interest by being barred from school grounds), *cert. denied*, 515 U.S. 1160, 115 S.Ct. 2612, 132 L.Ed.2d 856 (1995), and we conclude that the principle remains viable and is applicable here.

 Further, the search for specific substantive directives to the decisionmaker is context-specific.

It should be obvious that the mandatory language requirement is not an invitation to courts to search regulations for *any* imperative that might be found. The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether [the plaintiff] may be deprived of the particular interest in question.

*Kentucky Department of Corrections v. Thompson*, 490 U.S. at 464 n. 4, 109 S.Ct. 1904 (emphases in original). Thus, a mandate constraining the decisions of officials on one set of facts, and thereby establish-

ing one liberty interest, does not create a liberty interest in different circumstances.

 Finally, the fact that a state has established procedures to be followed does not mean that it has created a protectable liberty interest.

> Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.... The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.

*Olim v. Wakinekona,* 461 U.S. at 250–51, 103 S.Ct. 1741 (footnote omitted). Thus, a statute that merely establishes procedural requirements does not thereby create a liberty interest, because an " 'expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause.' " *BAM Historic District Association v. Koch,* 723 F.2d 233, 237 (2d Cir.1983) (quoting *Olim v. Wakinekona,* 461 U.S. at 250 n. 12, 103 S.Ct. 1741); *see also Cofone v. Manson,* 594 F.2d 934, 938 (2d Cir.1979).

## B. *New York State Law*

In ruling that Rodriguez and Andrew possessed a constitutionally protected liberty interest in their foster-family relationship, the district court relied on eight statutory and regulatory provisions of New York law, which provide as follows:

> (1) "Foster parents having had continuous care of a child, for more than twelve months, through an authorized agency, shall be permitted as a matter of right, as an interested party to intervene in any proceeding involving the custody of the child." N.Y. Soc. Serv. Law § 383(3) (McKinney 1992).

> (2) When the family court accepts the surrender of a child for adoption, "the court shall inquire whether any foster parent or parents with whom the child resides, or any relative of the child, or other person, seeks to adopt such child. If such person or persons do seek to adopt such child, such person or persons may submit, and the court shall accept, all such petitions for the adoption of the child, together with an adoption home study.... The court shall thereafter establish a schedule for completion of other inquiries and investigations necessary to complete review of the adoption of the child and shall immediately set a schedule for completion of the adoption." *Id.* § 383–c(10) (McKinney 1992).

> (3) An authorized agency "must ... inform foster parents that a child in their care who is free or to be freed for adoption and inform foster parents who have not completed an application to become adoptive parents of the procedure for applying to adopt the child." N.Y. Comp.Codes R. & Regs. tit. 18, § 421.19(a)(1) (1999).

> (4) "Any adult husband and his adult wife and any adult unmarried person, who, as foster parent or parents, have cared for a child continuously for a period of twelve months or more, may apply to such authorized agency for the placement of said child with them for the purpose of adoption, and if said child is eligible for adoption, the agency shall give preference and first consideration to their application over all other applications for adoptive placements." N.Y. Soc. Serv. Law § 383(3).

> (5) In authorized agencies' evaluation of adoption applicants, "foster parents seeking to adopt a child who has resided in their home 12 continuous months ... shall receive first priority for adoption studies." N.Y. Comp.Codes R. & Regs. tit. 18, § 421.13(a)(1).

> (6) "In any agreement between an authorized agency and foster parents with whom a child or children are to be placed or boarded, there shall be contained therein the following language: 'It is duly acknowledged by the parties hereto that pursuant to the law of the state of New York, a foster parent shall have preference in any proceedings to adopt the child subject to this agree-

ment upon such child having been in the custody of such foster parent for a period in excess of twelve months.'" N.Y. Soc. Serv. Law § 374(1–a)(McKinney 1992).

(7) Foster parents "in whose home the child resided or resides at or after the expiration of a continuous period of twelve months in foster care" shall receive notice of a hearing to review the foster care status of a child who has been freed for adoption, among other events. *Id.* § 392(4)(c).

(8) An adoption subsidy is available for "hard to place children." Among several other grounds, "the child is hard to place with parent(s) other than his/her present foster parent(s) because he/she has been in care with the same foster parent(s) for 18 months or more prior to the signing of the adoption placement agreement by such foster parent(s) and has developed a strong attachment to his/her foster parent(s) while in such care and separation from the foster parent(s) would adversely affect the child's development." N.Y. Comp.Codes R. & Regs. tit. 18, § 421.24(a)(3)(iii)(f).

We see in these sections no language providing substantive predicates for, or substantive limitations on, the exercise of official discretion with respect to matters of removal or visitation. The provisions designated (1), (2), (3), and (7) confer on foster parents certain procedural rights—the rights to intervene in a custody proceeding, to petition for adoption, and to receive notice that a child in their care has been made available for adoption or freed for adoption. But, under the principles discussed above, the establishment of these merely procedural requirements—even if they purported to govern visitation matters, which they do not, or to govern removal unrelated to possible adoption proceedings, which at least provisions (2), (3), and (7) do not—do not suffice to create the liberty interests asserted by plaintiffs. Provisions (4), (5), and (6) give foster parents a "preference" or "priority" over another applicant seeking to adopt a child if the child has been in the foster parents' custody for at least 12 months. While these provisions doubtless encourage foster parents to adopt their foster children, they do not purport to deal with, much less create substantive rights with respect to, a foster child's removal, return, or visitation. "[T]he preference of Social Services Law § 383(3) in adoption applications is substantially unrelated to determinations concerning the removal of foster children from foster homes, which remains in the broad discretion of the custodial agency." *Ferri v. County of Broome,* 154 A.D.2d 771, 772, 546 N.Y.S.2d 223, 224 (3d Dep't 1989).

Finally, provision (8), which affords an adoption subsidy for children who are "hard to place," undeniably gives an incentive for potential adoptive parents to become foster parents as a means to adoption, and thereby helps to implement New York's policy favoring foster parenting as a precursor to adoption. But, despite its reference to a "separation from the foster parent(s)," it imposes no relevant substantive limitations on official discretion with respect to matters of removal and visitation. We cannot conclude that § 421.24(a)(3)(iii)(f) gives a subsidy recipient the liberty interests claimed by Rodriguez.

Plaintiffs also cite a State regulation that provides that "[e]fforts to remove a child from the care and custody of his biological parent, adoptive parent, or legal guardian shall be undertaken only when it is clearly established that such action is in such child's best interest." N.Y. Comp. Codes R. & Regs. tit. 18, § 421.2(b) (1999). Although Rodriguez falls within the regulations' definition of "adoptive parent," *see id.* § 421.1(c) (1999) (including within that definition "a person with whom a child has been placed for adoption"), she cannot avail herself of § 421.2(b) because, as the Adoptive Placement Agreement makes clear, Andrew was not in Rodriguez's custody. Custody remained with McCloskey, and thus the regulation governing remov-

als of a child from a parent or guardian's "care and custody" was inapplicable to Rodriguez.

In sum, none of the statutory or regulatory sections called to our attention contains any substantive predicates or explicitly mandatory language giving directives to decisionmakers as to the cohabitation or visitation rights of a foster mother and child in the wake of an emergency removal of the child from the foster home. We cannot conclude that these provisions are sufficient to give plaintiffs the liberty interests they assert.

C. *The Adoptive Placement Agreement*

██ Finally, we are unpersuaded that a protectable liberty interest was created by the fact that Rodriguez and McCloskey had entered into the Adoptive Placement Agreement. Though the district court found that that Agreement created in Rodriguez expectations of permanence, the terms of the Agreement made clear that adoption was not a foregone conclusion and that the agency retained both custody of Andrew and discretion to determine whether his best interest would be served by effectuating the adoption or by removal from the foster home. The Adoptive Placement Agreement provided, *inter alia,*

— that Rodriguez "underst[oo]d that legal custody remains with Card. McCloskey";

— that the Agreement was to "remain in effect until the date of legal adoption";

— that "legal adoption will take place after both Card. McCloskey and [Rodriguez] agree that it is in the child's best interest";

and

— that if at any time prior to the legal adoption "it is determined by the agency or" by Rodriguez that the child should be removed from the foster home, Rodriguez would cooperate with the agency in carrying this out in a way that serves the best interest of the child "in the judgement of the agency."

Thus, the Agreement was explicit that the agency, not Rodriguez, was Andrew's legal custodian and would remain so until the adoption was finalized. We see no contractual provisions placing substantive limitations on the agency's judgment as to whether adoption or removal would be in the best interest of the child. We cannot conclude that the State's standard form Adoptive Placement Agreement so augmented the statutory and regulatory provisions as to give plaintiffs a liberty interest in the foster relationship prior to the adoption's finalization.

The City, on this appeal, "acknowledges that" if plaintiffs had a constitutionally protected liberty interest, "the hearing plaintiff received here was too long after the emergency removal to satisfy procedural due process standards." (City brief on appeal at 36.) And its Child Welfare Agency, expressing fitting concern for the emotional well-being of a four-year-old child removed from the foster care of the only parent he had ever known, called McCloskey's postremoval denial of visitation "very questionable since neither Mrs. Rodriguez nor ... Andrew could obviously have been prepared for their separation from each other and visiting could have helped the child's understanding of the situation." (CWA Decision at 9.) Ensuring appropriate treatment by the private agencies that the City chooses to authorize to administer foster care remains a matter for supervision by state and local legislative and administrative bodies. It is to be hoped that those authorities will take appropriate steps to prevent the recurrence of judgmental errors such as this.

## CONCLUSION

We have considered all of plaintiffs' arguments on this appeal and have found in them no basis to conclude that plaintiffs have shown a liberty interest protected by the Due Process Clause. The judgment is

reversed and the matter is remanded for dismissal of the complaint.

No costs.